**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RAHHEEN JABBAR FLIM,** | : | **Civil No. 1:22-CV-1619** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.

1

Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Rahheen Flim filed applications for social security and disability income benefits on November 28, 2018, alleging an onset of disability on January 30, 2018. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Flim was not disabled from the date of his application through the date of the ALJ's decision, October 19, 2021.

Flim now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we recommend that the district court affirm the decision of the Commissioner denying this claim.

## II.   **Statement of Facts and of the Case**

### A. **Background**

The administrative record of Flim's disability application reveals the following essential facts: On November 28, 2018, Rahheen Flim originally filed an

application for supplemental security income and disability insurance benefits, alleging disability beginning January 30, 2018. (Tr. 160-61). According to Flim, he was completely disabled due to the combined effects of Crohn's disease and mental health issues, including major depressive disorder and bipolar disorder. (Tr. 22, 146-47). Flim was 38 years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Tr. 35). He has a 10th grade education and has past relevant work as a counter/wrapper and sorter/inspector. (Id.)

### B. **Flim's Clinical Record**

Although the plaintiff primarily challenges the ALJ's determination with regard to his mental RFC, the clinical record demonstrates, and the plaintiff argues, that his mental and physical impairments were often intertwined. With regard to Flim's Crohn's disease, the ALJ observed that:

> In terms of the claimant's Crohn's disease, the record documents a long history of treatment for his condition dating back years prior to the alleged onset date (Exhibit B2F, Pgs. 574 and 626). The record establishes that the claimant had an open total abdominal colectomy with end ileostomy on February 6, 2014 secondary to poorly controlled Crohn's disease, diffuse and abscess formation (Exhibit B2F, Pg. 273). Gastroenterology records from October 30, 2015 note the claimant's ostomy was working well and the Crohn's disease was being managed with biologic medication (Exhibit B2F, Pg. 77). Gastroenterology records from May 10, 2017 note the claimant has some abdominal discomfort 'off and on', but was overall doing very well (Exhibit B2F,

Pg. 30). Gastroenterology records from April 18, 2018 indicate the claimant had done well since his ileostomy and was managed on a single agent, Humira. Physical examination findings indicate the abdomen is soft, non-tender, with normo-active bowel sounds in all four quadrants. There is no hepatosplenomegaly appreciated, no masses are palpated and no guarding or rebound is noted. The claimant is noted to have a right-sided ostomy with brown stool and healed incision scars (Exhibit B2F, Pg. 14). An MRI of the abdomen from May 30, 2018 indicate there were no segments of small bowel wall thickening or hyperemia to indicate active inflammatory bowel disease, no fistula or abscess and no abnormalities of the ileostomy (Exhibits B1F, Pg. 7 and B3F, Pg. 48). Further, gastroenterology records from October 16, 2018 indicate that the Crohn's disease was in remission and the claimant should continue with medication management (Exhibit B2F, Pg. 7).

Treatment records from February 8, 2019 show the claimant continued treatment with a gastroenterologist. These records state that CT enterography from May 2016, 2017 and 2018 showed no active disease. Physical examination findings indicate the abdomen is soft, non-tender, with normo-active bowel sounds in all four quadrants, no hepatosplenomegaly is appreciated, no masses are palpated, no guarding or rebound is noted and the ostomy is working. These records indicate a mild level of abdominal pain and no complications. These records again note the claimant was doing well, continue with Humira and routine follow-up in six months (Exhibits B6F, Pgs. 7-10 and B10F). Physical examination findings from April 11, 2019 note some tenderness around the bag in the right lower quadrant and mild leaking, but no other abnormal findings associated with the abdomen. Of note, general clinical findings from this examination find normal range of motion of the back, normal reflexes, full range of motion in the extremities, normal gait and no motor or sensory deficits (Exhibits B6F, Pgs. 24-25 and B10F). Surgical records from April 16, 2019 note emptying bag 1-2 times daily, no bleeding per ileostomy or per anus, no anal discharge apart from rare mucus as expected with rectal stump and no difficulty pouching ileostomy. These records also note the claimant was doing well with ileostomy without issue and expressed no interest in reversing ileostomy at this time (Exhibits B6F, Pgs. 40 and

4

43 and B10F). Treatment records from 2019 also show the claimant having nutritional consultations related to weight gain (Exhibits B6F, Pgs. 60 and 78 and B10F). Treatment records from November 21, 2019 show the claimant reported having flank pain exacerbated by bending over for which he was prescribed for muscle spasms (Exhibits B6F, Pgs. 95-96 and B10F).

Treatment records from 2020 show continued treatment with a nutritionist and use of Humira (Exhibit B10F, Pgs. 49 and 54-55). Treatment records from April 29, 2020 indicate the claimant reported effectiveness of medication for Crohn's symptoms (Exhibit B11F, Pg. 13). Treatment records from May 27, 2020 note the claimant's last three weights from January, February and May 2020 were approximately 160 pounds (Exhibit B10F, Pg. 44). Treatment records from June 12, 2020 and July 10, 2020 again note the claimant was doing well on Humira (Exhibits B10F, Pgs. 36 and 41 and B11F, Pg. 4). Treatment records from August 27, 2020 show the claimant reported occasional cramping and spasms (Exhibit B10F, Pg. 30). Treatment records from December 1, 2020 note no problems with Crohn's, ileostomy working well, no bleeding from ileostomy or rectum (Exhibit B10F, Pg. 22). Subsequent treatment records from 2021 show ongoing management with Humira and examination findings from April 9, 2021 indicate no abdominal tenderness, no guarding or rebounding, normal musculoskeletal range of motion and no focal deficits present (Exhibit B10F, Pgs. 5 and 17). Treatment records from August 11, 2021 show there was an insurance issue with Humira, and the claimant reported to the effectiveness of the medication by indicating he was doing reasonably well on it with no diarrhea, bleeding or abdominal pain (Exhibits B13F, Pg. 5 and B15F, Pg. 5).

(Tr. 27-28). Thus, with regard to the plaintiff's Crohn's, the clinical record, as summarized by the ALJ indicates that, although he underwent an ileostomy in 2014, by the relevant period his Crohn's was in remission with medication and Flim

frequently reported to his gastroenterologist that he was doing well with the ileostomy and expressed no interest in having it reversed.

With regard to his mental impairments, the clinical record showed that, following a stint in inpatient mental health treatment in November 2018, Flim was treating his depression with medication and counseling and at times experienced unstable moods, but his mental status examinations were frequently unremarkable. As the ALJ summarized:

> In terms of the claimant's mental health, the record shows treatment for depression with medication from the claimant's medical doctor with no specific abnormal clinical findings (Exhibit B3F, Pg. 39). Treatment records from May 18, 2018 show the claimant was prescribed medication for sleep (Exhibit B2F, Pg. 11). The record shows brief inpatient mental health treatment from November 7, 2018 to November 11, 2018 for having suicidal ideation but requested to leave and was discharged. At the time of discharge, the claimant was fully oriented, his speech was normal, and his mood and affect were euthymic. The claimant's thought process was linear and goal-directed, and he denied any suicidal ideation. The claimant had grossly intact cognition and insight and judgment were fair (Exhibit 17F, Pgs. 3-4). The record shows the claimant transitioned into outpatient mental health treatment following this hospitalization and had additional adjustments to his medication regimen. Mental status examination findings from November 15, 2018 indicate the claimant was clean and casually dressed, alert and oriented and had normal motor activity and clear speech. The claimant was anxious in mood, but had a full affect, logical thought process, relevant thought content, intact memory, average intellectual functioning and good insight and judgment (Exhibit B7F, Pgs. 23-24).

The record shows the claimant continued with outpatient treatment on February 5, 2019, consisting of counseling and medication management and had adjustments to his medication regimen. These records also show the claimant had a case manager (Exhibits B7F, Pgs. 17 and 20 and B12F, Pg. 130). Treatment records from April 11, 2019 from the claimant's medical provider note the claimant's reactive depression was stable with no abnormal clinical findings regarding mental status noted on examination (Exhibit B6F, Pgs. 24-25). A psychiatric evaluation from May 26, 2019 indicated mental status findings of casual dress, slightly unkept grooming, cooperative attitude, full orientation, irregular motor activity, regular speech, depressed mood, constricted affect constricted, linear and goal directed thought process, grossly intact memory, average intellectual functioning and fair insight, judgment, and impulse control. Mental health records from June 21, 2019 note the claimant's mood was stable and he denied any irritability, impulse control issues or mood swings (Exhibit B7F, Pgs. 10 and 14). The record shows the claimant continued with counseling services that also assist him with paperwork and obtaining food with records from September 17, 2019 noting the claimant was able to go to a Mexican restaurant with his case manager, where the claimant introduced the case manager to the place and showed him around (Exhibit B12F, Pgs. 97, 106 and 117). Mental health treatment records from November 12, 2019 show some instability in mood for which there was an increase in medication, but medical treatment records from November 21, 2019 note the claimant was feeling "so-so", but able to sleep through the night with medication (Exhibits B6F, Pg. 95 and B7F, Pgs. 4-5).

Mental health treatment records from February 4, 2020 show the claimant reported some stress and having anxiety "on and off", and the mental status findings were generally within normal limits aside from noting a constricted affect and fair insight and judgment (Exhibit B8F, Pg. 10). Medical treatment records from February 26, 2020 show the claimant was feeling more depressed after recently being denied his claim for Social Security benefits. These records indicate the claimant was on medication and receiving counseling, and he was still using medication to help with sleep (Exhibit B10F, Pg. 52). Mental health

treatment records from March 3, 2020 show the claimant having some instances of unstable mood and changes to his medication regimen (Exhibit B8F, Pgs. 8-9). However, records from April 28, 2020 note the claimant reported a stable mood and denied any impulse control issues, racing thoughts or mood swings (Exhibit B8F, Pg. 4). Counseling records from March 30, 2020 show the claimant was able to go to a corner store but was asked to leave so he was not exposed to Covid (Exhibit B12F, Pg. 65). Subsequent mental health treatment records in 2020 note a stable mood (Exhibit B9F, Pgs. 13, 15 and 17). Counseling records from June 11, 2020 note the claimant was able to travel to a birthday party in New Jersey and was going out for a ride with a friend (Exhibit B12F, Pg. 44). Medical treatment records from August 27, 2020 show the claimant reported taking medication when needed and for sleep. Mental status findings from this time show alert and baseline status with normal mood, affect, thought content and judgment (Exhibit B10F, Pgs. 30 and 32). Counseling records from December 23, 2020 indicate the claimant reported that all was good with his physical and mental health (Exhibit B12F, Pg. 27).

In 2021, treatment records from January 20, 2021 show the claimant reported fluctuating depression symptoms and a change in medication due to fatigue (Exhibit B9F, Pgs. 11-12). The record shows the claimant continued counseling services, including also taking him to appointments, such as for adjustments to his dentures (Exhibit B12F, Pg. 77). However, treatment records in 2021 show the claimant did achieve a stable mood and denied irritability, mood swings, racing thoughts or impulse control issues (Exhibit B9F, Pgs. 5, 7 and 9). Counseling records from April 23, 2021 note the claimant reported doing well and getting out more. The claimant reported his medication was working better and he had not been angry or irritable (Exhibit B12F, Pg. 11). Mental health records from June 24, 2021 note the claimant's mood was stable, but he had situational depression and anxiety due to legal troubles and an upcoming court date. These records note the claimant was sleeping 8 to 10 hours a night. Mental status findings indicate the claimant was in a euthymic mood, fully oriented with clear speech and displayed linear thought process, relevant thought content, intact memory, average intellectual functioning and fair insight

and judgment (Exhibit B16F, Pg. 5). Counseling records from July 8, 2021 note the claimant reported doing "way better" (Exhibits B12F, Pg. 3 and B14F). Mental health treatment records from July 22, 2021 note the claimant was feeling well with his present medication regimen, and records from September 2, 2021 note the claimant was anxious about the outcome of his disability hearing, but he reported being alright and he was in a euthymic mood (Exhibit B16F, Pgs. 1 and 3).

(Tr. 28-30).

The ALJ also considered the consultative evaluation of Dr. Jennifer Betts,

which forms the basis of the plaintiff's complaint. As the ALJ explained:

In addition to the mental health treatment records, the claimant had a consultative mental status evaluation performed by Jennifer Betts, Psy. D. on March 14, 2019 (Exhibit B4F). At this examination, the claimant reported poor sleep and appetite, depression with suicidal ideation and panic, but denied thought disorder or cognitive problems. The claimant reported significant stigma regarding his ileostomy. On examination, the claimant was depressed and withdrawn with slouched posture, no direct eye contact and lethargic motor activity, but he was cooperative, thus the examiner found social skills were fair to poor. The claimant had body odor, but his manner of dress was appropriate and casual. The claimant was fully oriented, his speech was clear and there was no evidence of hallucinations, delusions or paranoia. The claimant had average cognitive function and a coherent and goal-directed thought process. The claimant had intact recent and remote memory skills were intact as he could complete up to 6 digits forward and 3 digits backward and name 3 objects immediately and again delay. The claimant had intact attention and concentration was intact as he was able to count 20 by 2s, complete simple calculations and completed serial-7s. The claimant was considered to have fair to poor judgment associated with the claimant's lack of involvement in appropriate treatment (Exhibit B4F).

(Tr. 30). Thus, the ALJ acknowledged that Flim presented as depressed and that he had poor social skills and judgment, but also noted examination findings showing normal, coherent cognitive functioning, intact memory, attention, and concentration, and cooperative attitude.

### C. **Flim's Self-Reported Activities of Daily Living**

The ALJ also considered Flim's statements about his activities of daily living and found inconsistencies between Flim's testimony about his abilities and the other evidence in the clinical record. The ALJ summarized:

> The claimant testified that he lives with his mother and stepfather. The claimant also submitted a statement that he was planning on moving in with a friend, but it did not work out and he briefly lived with another friend for four days, but then moved back home (Exhibit B24E). The claimant testified his friends come to see him and they try to get him to go out and do some things. The claimant testified he does sit outside the home with friends and will visit with his daughter when she is in town, as she normally resides out of the state. The claimant testified he was able to go to a local amusement park when she was in town for approximately three hours and rode one ride. The claimant testified he does watches television and hangs out with a friend(s)to pass the time. The claimant testified his current mental health medication regimen makes him feel less groggy and he has had some level of improvement with medication changes and learning coping skills. In addition, the claimant reported being able to prepare simple meals, doing some household chores, walking places he has to go, using public transportation, shopping in stores, counting change and using a checking account. The claimant reported he is good at following written instructions and okay at following spoken instructions. The claimant reported no specific problems getting along with family, friends, neighbors or others, including authority figures. (Exhibit 6E). The

claimant testified he has disrupted sleep from worrying about breaking his bag while sleeping. However, as discussed above with the treatment records, the claimant has reported achieving sleep with medication. While the undersigned did not place undue weight on any single activity, and while the undersigned acknowledges that the claimant has some degree of limitations in performing activities of daily living, taken together with the above medical evidence of record, these activities suggest that the claimant can perform work within the above parameters.

The record also contains some inconsistent statements regarding the claimant's level of activity. The claimant testified he does not go out to eat because he is embarrassed of his bag and he does not eat much. However, treatment records from September 17, 2019 note the claimant went to a Mexican restaurant with his case manager (Exhibit B12F, Pg. 97). In addition, treatment records from May 27, 2020 note the claimant reported that he has restaurant meals twice a month, such as Chinese food, pizza or McDonalds (Exhibit B10F, Pg. 44). The claimant testified he does not leave the home much, but counseling records from March 30, 2020 show the claimant was able to go to a corner store, although he was asked to leave so he would not be exposed to Covid (Exhibit B12F, Pg. 65). Counseling records from June 11, 2020 note the claimant was able to travel to a birthday party in New Jersey and was going out for a ride with a friend (Exhibit B12F, Pg. 44). Lastly, records from August 2020 note the claimant was reporting right arm numbness when riding a 4-wheeler but testified that he had not done this in years despite it being reported in current treatment records (B10F, Pg. 33). Although this inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, the inconsistencies nevertheless suggest that the information provided by the claimant generally may not be entirely reliable when compared to the objective medical evidence discussed in detail above. As such, the claimant's testimony is only partially persuaded because while it supports some limitations, it is not entirely consistent with the level of limitation alleged by the claimant or with the objective medical evidence as discussed above.

(Tr. 32-33).

**D. <u>The Expert Opinion Evidence</u>**

Given this clinical picture, and Flim's self-reported activities of daily living, two State agency consultants and the consultative psychological examiner Dr. Betts opined regarding whether Flim's impairments were disabling. With respect to his physical conditions, the April 2019 State agency physical assessment of Dr. Scovern found Flim could perform a full range of light exertional work, (Tr. 136-37). He opined that Flim could occasionally lift 20 pounds and frequently lift 10 pounds; that he could stand and/or walk for a total of 6 hours and sit for a total of 6 hours in an eight-hour workday; and that he was unlimited in his ability to push and/or pull. (Tr. 140). He observed no postural, manipulative, visual, communicative, or environmental limitations. (<u>Id.</u>) Dr. Scovern noted that Flim had been cleared for light work by his physician in April 2018 and a subsequent MRI showed some probable Crohn's activity but no serious complication since his total colectomy and end ileostomy and that his stoma was functioning well. (<u>Id.</u>) He also noted the March 2019 consultative examination observing no physical difficulty. (<u>Id.</u>)

As for Flim's mental impairments, State agency psychologist Dr. Lori Young and consultative examining psychiatrist Dr. Betts both assessed limitations with regard to Flim's mental RFC. Dr. Young opined that Flim was able to meet basic

mental demands on a sustained basis despite certain limitations from his impairments. (Tr. 143). Specifically, Dr. Young opined that Flim had a mild limitation in his ability to understand, remember, or apply information, but moderate limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (Tr. 137). She acknowledged his previous psychiatric hospitalizations at age 21 and in November 2018 and reported sleep disturbance, poor appetite, significant depression, and severe social withdrawal. (Tr. 138). She also considered the consultative examination findings showing he was cooperative but depressed and withdrawn with fair to poor social skills and poor hygiene and grooming, lethargic motor behavior, and depressed mood and affect but noted that his attention/concentration and memory skills were intact and that he reported preparing simple food, using public transportation, going out alone, shopping in stores, and counting change/using a checkbook in his function report, although he noted receiving assistance with his activities of daily living due to low motivation.

Based on Dr. Young's review of Flim's medical records and self-reported activities of daily living, she opined that he had no understanding and memory limitations and was not significantly limited in his ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, or make simple work-related decisions, but that he was moderately limited in his ability to

13

carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, work in coordination with others, and complete a normal workday and workweek without interruptions from his psychological impairments. (Tr. 141). As to his social interaction limitations, Dr. Young opined that Flim was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, but he was not significantly limited in his ability to ask simple questions or request assistance. (Tr. 142). She also noted moderate adaptation limitations, including in his ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Id.)

Dr. Young acknowledged that her assessment was different than the opinion of consultative examiner Dr. Betts, explaining:

> The residual functional capacity assessment is different than the opinions expressed by the medical source due to inconsistencies with the totality of the evidence in file. Some of the opinions cited in the report are viewed as an overestimate of the severity of the claimant's functional restrictions. The medical source statements in the report

14

concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments, making personal and social adjustments and other related activities are not consistent with all of the medical and non-medical evidence in the claims folder. It appears that the medical source relied heavily on the subjective report of symptoms and limitations provided by the claimant. However, the totality of the evidence does not support the claimant's subjective complaints. The opinion provided by the medical source is based on a brief clinical encounter. While the medical source provides some insight, the medical source does not provide insight that would exist from a longitudinal treatment history. The opinion is an overestimate of the severity of the claimant's limitations. Finally, the report submitted by the medical source is not supported and is not consistent with this assessment.

(Tr. 142).

Thus, although Dr. Young assessed moderate limitations Flim's ability to interact with others, in contrast, Dr. Betts opined that Flim had marked limitations in all social interactions, including interacting appropriately with the public, supervisors, co-workers, and responding appropriately to usual work situations and changes in a routine work setting. (Tr. 2127). She attributed these marked limitations to Flim's reports that he had not left his house in a year. (Id.) Moreover, while Dr. Young found only mild limitations in Flim's ability to understand, remember, and apply information, Dr. Betts opined that Flim had moderate limitations in carrying out even simple instructions and making judgments on simple work-related decisions and marked limitations in his ability to carry out complex instructions and

make judgments on complex work-related decisions. (Tr. 2126). Dr. Betts explained that, although he had no comprehension or memory problems, his limitations in this arena were attributed to his severe depression with complicating medical problems. (Id.) Dr. Betts also opined that Flim would have limitations in motivation, pace, and persistence. (Tr. 2127). Dr. Betts acknowledged that Flim used cannabis to increase his appetite but opined that his minimal cannabis use was unlikely to change his function.[1] (Id.)

It was against this backdrop that Flim's disability claim came to be heard by the ALJ.

---

[1] In a footnote, the plaintiff argues that the ALJ inappropriately found Flim's cannabis use to be a severe impairment and weighed it adversely against his claim. (Doc. 9, at 12 n.4). The ALJ did note that mental health treatment records from November 15, 2018, diagnosed a cannabis use disorder and found that, because it appeared to be ongoing in nature, the impairment was severe. (Tr. 31). But, in fact, the ALJ stated that Flim's cannabis use disorder was not material to the decision since the treatment records did not address the specific deficits associated with the impairment. (Tr. 31-32). And, while the ALJ did note in passing that, without the cannabis use disorder, Flim would likely only have mild limitations in understanding, remembering, and applying information while the ALJ assessed moderate limitations in these areas, (id.), it is unclear how adopting a more conservative limitation in this area weighed adversely against the plaintiff, who generally argues the limitations adopted by the ALJ were not conservative enough.

### E. **The ALJ Decision**

On September 22, 2021, the ALJ conducted a hearing in Flim's case, at which the plaintiff and a vocational expert testified. (Tr. 83-131). Following the hearing, on October 19, 2021, the ALJ issued a decision denying Flim's claim. (Tr. 16-43). In that decision, the ALJ first concluded that Flim had not engaged in substantial gainful activity since January 30, 2018, the alleged onset date. (Tr. 22).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Flim had the following severe impairments: Crohn's disease of the small intestine with a history of ileostomy, major depressive disorder, bipolar disorder, unspecified, and cannabis use disorder. (Id.) The ALJ also acknowledged a history of narcotics use, mild degenerative disc disease of the cervical spine, remote history of right arm numbness, tobacco use, hypokalemia, and vitamin D deficiency as medically determinable impairments but established that they were not severe. (Id.)

At Step 3, the ALJ determined that Flim did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 23-26). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Flim's impairments as reflected in the medical record, and found that:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to occupations that require no more than occasional postural maneuvers, such as stooping, kneeling and climbing on ramps and stairs, but must avoid occupations that require climbing on ladders, ropes and scaffolds or crouching, or crawling. The claimant is limited to occupations that require no more than frequent balancing. The claimant is limited to simple, routine repetitive work, generally described as unskilled, with no more than a specific vocational preparation (SVP) of two and that is low stress, defined as only occasional decision making required and only occasional changes in the work setting. The claimant is limited to occupations which require no more than occasional interaction with supervisors and coworkers and no interaction with members of the general public.

(Tr. 26).

In fashioning this RFC, the ALJ considered the clinical evidence, medical opinions and Flim's activities of daily living. (Tr. 26-33). Further, in fashioning the RFC, the ALJ considered the medical opinions and prior administrative medical findings. In this regard, the ALJ found the physical assessment of Dr. Scovern, that Flim could perform a full range of light exertional work, persuasive.

As to the opinion evidence regarding Flim's mental impairments, the ALJ struck a balance between Dr. Young and Dr. Bett's opinions in fashioning the RFC, finding both opinions partially persuasive. For example, the ALJ found the opinion of Dr. Young partially persuasive but provided greater limitations in public interaction in deference to Flim's limited degree of social activity and based on

objective deficits regarding mood fluctuations and anxiety and depression symptoms. (Tr. 34). But the ALJ also noted that records submitted after the date of Dr. Young's opinion contained clinical findings that continued to support her opinion, including euthymic mood, full orientation with clear speech and linear thought process, relevant thought content, intact memory, average intellectual functioning, and fair insight and judgment and that he was doing well with a conservative level of treatment. (Id.)

The ALJ also found Dr. Betts' opinion partially persuasive and provided the following cogent analysis of this opinion:

> The undersigned found this opinion partially persuasive. It is persuasive to the extent that it is supported by and consistent with the evidence. In terms of the portion of the opinion regarding simple instructions and decisions, the finding of no limitation with understanding and remembering is supported by the clinical findings of average cognitive function, coherent and goal-directed thought process and intact memory and concentration. However, these findings also do not support the finding of moderate limitation is [sic] carrying out simple instructions and making simple work-related decisions. While the clinical findings indicate fair to poor judgment, they are based in part on the claimant not receiving appropriate treatment, which is somewhat inconsistent with the record that showed outpatient counseling and medication management services. Similarly, in regard to the portion of the opinion for complex instructions, these findings support no limitation in understanding and remembering, but the treatment records do show inconsistent findings to a degree as the claimant has some level of anxiety and racing thoughts that would support a moderate limitation in this area. In terms of the marked limitations, they are simply not supported by the above clinical findings of average cognitive function,

coherent and goal directed thought process and intact memory and concentration. In addition, the claimant's conservative level of treatment and clinical findings from the treatment records of intact memory, coherent and relevant thought process and content, average intellectual functioning and fair insight and judgment would not support the marked limitations (Exhibit B16F, Pg. 5). In terms of the social and adaptive limitations, the marked limitations were not supported aside from the limitation to public interaction. The clinical findings from the examination showing the claimant was depressed and withdrawn with slouched posture, no direct eye contact and lethargic motor activity and his social skills were fair to poor, which supports some degree of limitation in interaction. However, the claimant was also cooperative. The limitations are not fully consistent with the treatment records and testimony which shows the claimant has friends that come to visit him and a good relationship with his case manager. The marked limitation to public interaction is supported as the claimant does not do much socially and has mood instability at times, but as discussed above, he is able to go to some public restaurants. In terms of adaption, the marked limitation is not supported by the clinical findings from this examination, as it notes fair to poor judgment in terms of the claimant's level of treatment, but otherwise finds average cognitive function, intact memory and attention and cooperative attitude. A marked limitation in this area is also not consistent with the claimant shopping in stores, using public transportation, using a checking account and following written and spoken instructions (Exhibit B6E). Therefore, the undersigned found this opinion partially persuasive.

(Tr. 30-31).

Having arrived at this RFC assessment, the ALJ concluded that Flim was capable of performing his past relevant work as a sorter/inspector and found that Flim had not met the exacting standard necessary to secure Social Security benefits. (Tr. 35-37).

20

This appeal followed. (Doc. 1). On appeal, Flim argues that the ALJ erred in assessing the opinion of Dr. Betts and that the RFC was not supported by substantial evidence. This appeal is fully briefed and is, therefore, ripe, for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

22

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In Hess the court of appeals considered the question of whether

an RFC which limited a claimant to simple tasks adequately addressed moderate

24

limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of

the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3)

whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an

27

assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration

when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence

The plaintiff filed this disability application after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security

claims. Prior to March 2017, ALJs were required to follow regulations which defined

medical opinions narrowly and created a hierarchy of medical source opinions with

treating sources at the apex of this hierarchy. However, in March of 2017, the

Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially, and the approach to evaluating opinions was changed from

a hierarchical form of review to a more holistic analysis. As one court as aptly

observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and

supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); <u>Connors v. Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### D.    <u>The ALJ's Decision is Supported by Substantial Evidence</u>.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. We also acknowledge that an ALJ's mental RFC assessment does not have to follow any particular format and should be upheld "as long as the ALJ offers a 'valid explanation,'" for that assessment. <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019).

Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Flim retained the residual functional capacity to perform simple, routine repetitive work at the light exertional level with the additional articulated limitations. Therefore, we will affirm this decision.

This case primarily involves the ALJ's treatment of an examining source opinion. On this score, we note that our review is cabined by the Social Security regulations' evolving standards regarding the evaluation of medical opinion

34

evidence. As we have noted, after the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight. Moreover, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009). Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations.

Judged against these standards, Flim's argument that the ALJ failed to properly evaluate the examining source opinion of Dr. Betts fails for at least two

35

reasons. First, to the extent the plaintiff's argument centers around the proposition that the ALJ was required to include each limitation assessed by Dr. Betts in partially crediting her opinion, it is well settled that "[a]n ALJ is entitled generally to credit parts of an opinion without crediting the entire opinion . . . [and] an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions." <u>Durden</u>, 191 F.Supp.3d at 455, and "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." <u>Titterington</u>, 174 F. App'x at 11. Here, the ALJ expressly fashioned an RFC that encompassed parts of the opinions of Dr. Betts and Dr. Young that were supported by and consistent with the longitudinal evidence.

Moreover, this decision to adopt some, but not all, limitations assessed by Dr. Betts was not based upon the ALJ's lay opinion but was supported by substantial evidence from the longitudinal record and the opinion of the other medical source psychiatrist and was well articulated, focusing on the supportability and consistency of Dr. Betts' opinion. As explained above, after the paradigm shift in in the manner in which medical opinions are evaluated when assessing Social Security claims, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' [ ] [and] [a]n ALJ is specifically

required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)).   But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Thus, our inquiry is not whether evidence existed from which the ALJ could have drawn a contrary conclusion, but rather whether substantial evidence existed in the record to support the ALJ's decision to credit or discredit each medical opinion, and whether the ALJ appropriately articulated his decision under the regulations. Here, these requirements have been met. On this score, we find that, although as the plaintiff points out, evidence from which the ALJ could have drawn a contrary conclusion existed, we are cognizant that "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." Malloy v. Comm'r of Soc. Sec., 306 F. App'x 761, 764 (3d Cir. 2009).

So it is here. A review of the medical evidence provides support for the ALJ's decision. At the outset, as the other medical source opining on Flim's mental impairments, Dr. Young, noted, Dr. Betts' opinion was based on a single encounter,

which occurred prior to Flim beginning outpatient counseling treatment. (Tr. 2121). And the symptoms observed by Dr. Betts, including slouched posture, no direct eye contact, lethargic motor activity, were somewhat anomalous compared to the longitudinal medical records showing relatively normal mental status examinations. (Tr. 2169, 2241, 2255-57, 2260, 2262, 2266, 2280, 2294, 2296, 2298, 2302, 2304, 2306, 2502, 2622). Nonetheless, the ALJ largely credited the examination findings of Dr. Betts in incorporating some of her limitations in the RFC while adjusting the extent of the limitations based on the longitudinal evidence.

At the outset, the ALJ agreed with Dr. Betts' assessment that Flim had no limitation with understanding and remembering, but that the longitudinal evidence supporting no limitation with understanding and remembering, including clinical findings of average cognitive function, coherent and goal-directed thought process, and intact memory and concentration, belied Dr. Betts' opinion that he had a moderate limitation in carrying out simple instructions and making simple work-related decisions. Nonetheless, the ALJ did find the record supported Dr. Betts' moderate limitation in following complex instructions.

The plaintiff primarily challenges the ALJ's decision not to adopt many of the marked limitations set forth by Dr. Betts. On this score, the ALJ adopted the marked limitation in social interaction recommended by Dr. Betts, acknowledging that Flim

"does not do much socially," (Tr. 31) – he reported to Dr. Betts that he had not left the house in a year, (Tr. 2122) – and has mood instability at times. However, as the ALJ explained, while the clinical record supported some degree of social and adaptive limitations, the marked limitations in these fields were not supported by clinical findings of average cognitive function, coherent and goal-direct thought process, and intact memory and concentration. But the ALJ did not just rely on normal mental status examination findings in only partially crediting Dr. Betts' opinion as the plaintiff argues. The ALJ also noted that these limitations were not consistent with Flim's activities of daily living, including his ability to go to public restaurants, shop in stores, use public transportation, use a checking account, and follow written and spoken instructions. (Tr. 33, 451, 453).

The ALJ also found these limitations were not consistent with Flim's conservative mental health treatment; a finding that the plaintiff also challenges. But the record demonstrates that Flim's treatment was conservative. Indeed, courts have found that therapy and medication management, to which a claimant responds well, are properly categorized as conservative treatment. See e.g. Snodgrass v. Comm'r of Soc. Sec., No. 4:20-CV-02093, 2022 WL 853628, at *8 (M.D. Pa. Mar. 22, 2022) (citing Brown v. Comm'r of Soc. Sec., No. 19-cv-2110, 2020 U.S. Dist. LEXIS 44807 at * 18-19 (E.D. Pa. Mar. 16, 2020)). Here, although he had a mental health

hospitalization in November 2018, (Tr. 2133), following his hospitalization Flim began receiving outpatient counseling and medication management and was stable with this treatment. His mood was frequently reported as stable with normal mental status evaluations throughout 2019, 2020, and 2021, (Tr. 2169, 2241, 2255-57, 2260, 2262, 2266, 2280, 2294, 2296,  2298, 2302, 2304, 2306, 2502, 2622), and by mid-2021 he was reporting doing "way better," and that the treatment work working, (Tr. 2461), reported doing well and getting out more (Tr. 2469) and feeling well on his medication regimen. (Tr. 2620). Thus, viewed as a whole, the ALJ's decision to reject some of the limitations in Dr. Betts' opinion that were not consistent with or supported by the record was both properly articulated and supported by substantial evidence.

Finally, the plaintiff argues that the ALJ's decision not to include an off-task limitation of more than 30% or investigate his need to be off-task primarily due to his ileostomy bag was not supported by substantial evidence. The plaintiff cites to similar cases that have remanded where an ALJ did not investigate the number and duration of bathroom breaks required throughout the day for patients with Crohn's disease with a colostomy bag. The plaintiff bases this assertion off his testimony that he changes his colostomy bag four to six times a day and that he does not want to have to empty his bag in public restrooms. (Tr. 100-02). But Flim never testified that

he would need additional time at work for changing his bag, but rather that he preferred not changing it in public restrooms due to often unsanitary conditions. Moreover, as the Commissioner points out, he previously reported to his colorectal surgeon that he emptied his bag 1-2 times per day and that it was working well and he had no complaints. (Tr. 2185). Thus, we find no evidence, nor does the plaintiff direct us to any, tending to indicate that the ALJ was required to include an off-task limitation of more than 30%. In fact, the ALJ did include other postural limitations to account for Flim's ileostomy bag including no crouching, crawling, or climbing ladders, ropes, and scaffolds.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability

41

determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.  <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: July 10, 2024